UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Michael Williams,

Petitioner,

vs. REPORT AND RECOMMENDATION

James Bruton, Sued as
James H. Burton, Warden,

Respondent. Civ. No. 00-1320 (DSD/RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 24th day of June, 2003.

I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon a Petition for Writ of Habeas Corpus, under Title 28 U.S.C. §2254. For these purposes, the Petitioner has appeared pro se, and the Respondent has appeared by Gayle C. Hendley, Assistant Hennepin County Attorney. For reasons which follow, we recommend that the Petition for a Writ of Habeas Corpus be denied, and the case be dismissed with prejudice.

II. Factual and Procedural Background

The Petitioner is a State prisoner who, on March 4, 1997, was convicted, by a Jury, of two Counts of First Degree Criminal Sexual

(44)

JUN 24 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Conduct, and one Count of Kidnapping. He is currently serving a 268-month sentence, at the Minnesota Correctional Facility in Stillwater, Minnesota.

The Petitioner's conviction arises from an incident in April of 1996, when a fourteen year old girl alleged that she had been kidnapped, and raped, by the Petitioner, who lived in her apartment building. When the police were called, the victim described the attack, and her assailant. Vaginal fluid samples were taken from the victim and, upon the Petitioner's arrest, the police also obtained his DNA. Those samples were sent to the Bureau of Criminal Apprehension ("BCA"), where an analyst determined that the victim's vaginal fluids contained enough sperm for restriction fragment length polymorphism analysis. As a rule, it takes four months for the BCA to complete such an analysis. By November 18, 1996, the BCA had a preliminary report of its findings and, by December 18, 1996, a finalized report had been forwarded by the BCA to the prosecution, and the defense.

The finalized report revealed that there was less than a one in one billion chance that an individual selected at random, other than the Petitioner, would match the DNA from the victim's vaginal sample. On or about December 20, 1996, the Petitioner's attorneys requested the production of the working papers, which had been generated by the BCA, during the DNA analysis. The prosecutor im-

mediately forwarded that request, and the working papers were delivered to defense counsel, either on January 3 or 6, 1996. Those papers disclosed an anomaly, which led the defense to question whether, in fact, the Petitioner was the source of the semen found in the victim.

At a Pretrial Hearing, the Petitioner's attorney brought up the delay in his receipt of the BCA's working papers. See, Volume One of Transcript of Rasmussen Hearing, attached as an Exhibit to State's Answer to Petition for Writ of Habeas Corpus, ("Answer"), at p. 18. The Petitioner's attorney told the Court that he had informed the Petitioner that there were three potential ways to proceed: 1) they could ask the Court for a reasonable continuance to allow for an independent analysis of the DNA samples; 2) they could proceed with the Trial; and 3) they could move to suppress the evidence. Id. According to defense counsel, the Petitioner was concerned about whether he could be released from custody if the Trial was continued. Id. The Petitioner informed the Court that he understood his options, but that, unless he could be released from custody during any continuance, he wanted to proceed immediately to Trial. Id. at 8-9. The Petitioner was questioned several more times as to whether that was his decision, and he maintained that he wanted to move forward with the Trial, unless he could be released. Id. The Trial Court explained to the Peti-

tioner that the Court was willing to grant the continuance, but would not bargain with the Petitioner about his release during that time, as the two issues were independent of each other. Id. at 10-18. As a consequence, the Petitioner elected to proceed to Trial. Id. at 19.

On the following day, the Trial Court heard, and denied, the Petitioner's Motion to suppress the DNA evidence, and then proceeded to the issue of a continuance. See, Volume Two of Transcript of Rasmussen Hearing, attached as an Exhibit to State's Answer. On the Record, the Petitioner was again asked whether he understood that the Trial could be continued, in order to permit the defense to conduct its own DNA analysis, and he replied that he did, but that, against the advice of the Court and his counsel, he wanted to continue immediately to Trial. Id. at 27-31.

At Trial, a BCA scientist testified that the Petitioner's DNA, and the DNA taken from the victim's vaginal fluids, matched on all seven standard comparison criteria. The BCA scientist concluded that the chances that the sperm in the victim came from a source other than Petitioner were "vanishingly small." Ultimately, the Jury found the Petitioner guilty.

The Petitioner, who was again represented by counsel, filed a direct appeal of this conviction with the Minnesota Court of Appeals. There, the Petitioner argued that the Trial Court erred in

admitting the DNA evidence, and had wrongfully denied his right to a Speedy Trial.[1] In support of his arguments, the Petitioner cited only to State law, and did not allege a violation of any Federal law. See, Appellant's Brief attached as an Exhibit to State's Answer. As to the Petitioner's argument concerning the admission of the DNA evidence, the Court of Appeals held as follows:

> Here the record reflects that the state provided appellant with the DNA test results and work papers as soon as it had received them. The timing of the disclosure was not an intentional delay but rather a result of the BCA's standard processing time over which the state had no control. Even assuming that the disclosure was untimely and a violation of the discovery rules, the trial court enjoys wide discretion as to the imposition of sanctions. State v. Freeman, 531 N.W.2d 190, 197-98 (Minn. 1995)(trial court is peculiarly suited to determine appropriate remedy for discovery violation and has wide discretion in deciding whether to impose sanctions). The trial court found no discovery violation but did offer to continue the trial in response to appellant's allegation of a discovery violation. Such a remedy was clearly within the court's discretion * * * (citations omitted).

State v. Williams, 1998 WL 279207 at * 2 (Minn.App., June 2, 1998).

In support of his contention, that he should have been released from custody pending his Trial, the Petitioner again relied solely

[1]The Petitioner asserts that he attempted to raise all of the issues, which are contained in his Habeas Petition to the Minnesota Court of Appeals, in an Application for Leave to Appeal, which was denied. Petition, at ¶ 10. The Petitioner does not diclose when he filed that Application, and the Respondent argues that Petitioner never raised any Federal issues on direct appeal.

upon State law, namely, Rule 11.10, Minnesota Rules of Criminal Procedure. Id.

Under that Rule, a Trial must commence within sixty days of a demand for Speedy Trial, absent good cause shown for a delay and, if the Trial has not started within 120 days after that demand, the detainee must be released on nonmonetary conditions. Id. The Court found there was good cause shown for the delay -- namely the need to await the completion of DNA testing -- which, the Court noted, could have produced either inculpatory or exculpatory evidence. Id at *3. Further, the Court related that the Trial was scheduled to start on January 9, 1997, but was continued until January 13, 1997, because the Petitioner's attorney was ill and, then again, until January 14, 1997, because the prosecutor was ill. Id. Given these circumstances, the Court concluded that the Petitioner's right to a Speedy Trial was not violated, as "[a]ny delays were minor and occurred for reasons beyond anyone's control and for good cause." Id. The Petitioner appealed the Court of Appeals' decision to the Minnesota Supreme Court and, on July 30, 1998, his Petition for review was denied. See Order, State v. Williams, No. C0-97-993 attached as Exhibit to Answer.

Thereafter, in October of 1998, the Petitioner filed a Petition for Post-Conviction Relief. See Petition for Post-Conviction Relief, Exhibits, Docket No. 12. The Petitioner alleged that his

Fourth, Fifth, Sixth, and Fourteenth Amendment rights, had been violated by the admission of the DNA evidence, by the alleged violation of his right to a Speedy Trial, by the purported admission of false evidence, by an assertedly illegal search and seizure, by "deliberate misrepresentation of truth at trial" by the prosecutor, by the denial of effective assistance of his trial and appellate counsel. The Post-Conviction Court found that three of the Petitioner's allegations -- namely, that there was a lack of minorities on the Jury panel, that false evidence had been admitted at his Trial, and that his right to a Speedy Trial had been violated by the Court, and by his counsel[2] -- were procedurally defaulted, as those issues were known to the Petitioner, but not raised in his direct appeal. See, Order Denying Petition for Postconviction Relief attached as Exhibit to Answer, at 4.

With respect to his allegations of ineffective assistance of trial and appellate counsel, the Court held that those claims were without merit. Id. at 4-5. As explained by the Court:

---

[2]Although the Petitioner did raise a speedy Trial claim on direct appeal, the factual, and legal bases for his argument on direct appeal, and in his petition for post-conviction relief, were entirely different. As we previously related, on direct appeal the Petitioner's argument was based on an alleged violation of Rule 11.10, Minnesota Rules of Criminal Procedure. In his Petition for Post-Conviction Relief, the Petitioner's were based on his federally protected Constitutional right to a speedy Trial, and allegations that persons, including his attorney, the Court, and Prosecutor, had conspired to deprive him of this right.

> [The] Petitioner was represented by experienced counsel both at trial and on appeal. He also submitted written affidavits to the trial court raising his own issues and addressed the Court at length at sentencing with complaints regarding counsel and the way in which the trial was conducted. [The] Petitioner has made no showing that counsels' representation fell below an objective standard of reasonableness. In fact, a review of the record shows that his various attorneys vigorously represented him despite his actions of firing and rehiring them. The Court has reviewed Petitioner's claims of ineffective assistance of counsel and finds they were raised before both in the trial court and on appeal; they are without merit; and they are not supported by the record.[3]

---

[3]We find no other showing in the Record before us, for the Post-Conviction Court's finding that the Petitioner raised his ineffective assistance of counsel claims on direct appeal. We have reviewed the Petitioner's brief to the Minnesota Court of Appeals, and find that it raises only the issue of whether the Trial Court abused its discretion in denying the Petitioner's Motion to Suppress the DNA evidence, and whether his right to a Speedy Trial was violated. However, we do note that the Petitioner has alleged that he raised his ineffective assistance claims in his Application for Leave to Appeal, which neither party has presented to the Court, nor have we been presented with the Petitioner's Petition to the Minnesota Supreme Court. Accordingly, we accept, as true, the Post-Conviction Court's assertion, that the ineffective representation claims were raised on direct appeal, as that assertion appears not to be contested. In so doing, we construe the Petitioner's claims charitably so as to avoid any argument that these ineffective assistance claims were defaulted.

Moreover, even if the Petitioner had not properly raised his ineffective assistance of trial and appellate counsel arguments on direct appeal, it was, nevertheless, proper for the Post-Conviction Court to consider those claims on their merits. Minnesota Courts have consistently held that "'a direct appeal from a judgment of conviction is not the most appropriate way to raise a claim of in-

(continued...)

In May of 1999, the Petitioner filed a Section 2254 Petition with this Court. Finding that the Petitioner had failed to appeal the denial of his request for post-conviction relief, and had also presented claims in his Petition that had never been presented to the State Courts, either on direct appeal, or in a request for post-conviction relief, his Petition was summarily dismissed, without prejudice, in order to allow the Petitioner to exhaust his State remedies. Thereafter, the Petitioner prepared a Notice of Appeal of the Post-Conviction Court's decision but, erroneously, he sent that Notice to the Federal, rather than to the pertinent State Court. The Petitioner never remedied that error, and therefore, he has not exhausted his available State Court remedies.

---

(...continued)
effective assistance of trial counsel because the reviewing court does not have the benefit of all the facts concerning while defense counsel did or did not do certain things." Murray v. Wood, 107 F.3d 629, 631 (8th Cir. 1997), quoting Roby v. State, 531 N.W.2d 482, 484 n.1 (Minn. 1995)(quotation omitted); see also, Berg v. State, 557 N.W.2d 593 (Minn.App. 1996). Thus, "Minnesota courts will consider[] ineffective-assistance claims in postconviction proceedings even though [the] petitioner did not raise the claims on direct appeal." Scruggs v. State, 484 N.W.2d 21, 25 (Minn. 1992). Similarly, ineffectiveness of appellate counsel claims have been first considered upon post-conviction appeal. See, Wilson v. State, 582 N.W.2d 882, 886 (Minn. 1998); Black v. State, 560 N.W.2d 83, 86 (Minn. 1997), citing State v. Cermak, 350 N.W.2d 328, 332 n. 5 (Minn. 1984).

Nevertheless, the Petitioner filed this Section 2254 Petition on May 26, 2000.[4] Initially, we recommended that the Petition be summarily dismissed, as untimely under the relevant statute of limitations. See Docket No. 19. On March 8, 2001, the District Court, the Honorable John R. Tunheim presiding, adopted our Report and Recommendation, and entered Judgment dismissing the Petition. See, Docket Nos. 20 and 21. The Petitioner filed a Notice of Appeal, which sought a reversal of the Order dismissing his Petition, but he failed to obtain a Certificate of Appealability ("COA"), as required. Thus, the Court of Appeals for the Eighth Circuit remanded the case to the District Court, in order to determine whether the Petitioner should be granted a COA. Docket No. 24. By Order dated June 1, 2001, the District Court held that no COA would be granted to the Petitioner. Docket No. 26.

However, the Petitioner again appealed to the Court of Appeals for the Eighth Circuit, which granted a COA on the issue of whether his case had been properly dismissed, as untimely. See, Williams v. Bruton, 299 F.3d 981 (8th Cir. 2002). By Order dated

---

[4]Because the original Petition filed by the Petitioner was not "in a form which [was] substantially in compliance with the forms available from [our] Clerk of Courts," and did not contain all of the information requested in that Form, the Petitioner was directed, by Order dated June 13, 2000, to file an Amended Petition. Docket No. 5. The Amended Petition was filed on July 5, 2000. Docket No. 7.

August 20, 2002, the Court of Appeals concluded that the Petition had been filed within the time permitted under the relevant Statute of Limitations and, accordingly, reversed the Judgment of the District Court, and remanded the case for further proceedings. Id. We now consider the merits of the Petitioner's request for Habeas relief.

In his Petition, the Petitioner has asserted three grounds for the relief he seeks. First, he claims that the DNA evidence was illegally admitted at his Trial. In support of this claim, the Petitioner alleges that, despite knowing that the DNA evidence did not come from the Petitioner, the prosecutor and the Trial Court Judge admitted that evidence at his Trial. Petition, at 5. The second ground raised by the Petitioner is a claim that he was denied his right to a Speedy Trial. Here, the Petitioner alleges that, on June 3, 1996, the Petitioner told his attorney to demand a Speedy Trial the next day but that, instead, his then-attorney, "Mr. Wheat," and the Trial Court, "intentionally waived/denied [his] right to a speedy trial without his consent." Id. He also claims that his right to a Speedy Trial "was [again] denied by Public Defenders Susan Herlofsky and Rene Clemson" who, he claims, conspired with the prosecutor. Id.

Lastly, the Petitioner alleges a claimed ineffective assistance of counsel. As to that claim, the Petitioner contends as follows:

> Petitioner['s] counsel at every step and every counsel conspired with the State prosecutor which lead to [the] Petitioner['s] conviction when counsel refused to investigate which would've lead to Police involvement in frame-up and illegal search and seizure. Conspired in waiving Petitioner rights to Speedy Trial which caused DNA to be admitted in Trial. Refused to file motions and request disclosure of evidence that would've prevented false testimony and refused to raise appropriate appeal issues.

Petition, at 6.

In its response to the Petition, the Respondent has argued that each of the Petitioner's claims is procedurally defaulted for two reasons: 1) because the Petitioner did not raise any Federal issues on direct appeal of his conviction; and 2) because he did not appeal the Post-Conviction Court's decision, which denied his claims that his federally protected constitutional rights had been violated.

## III. Discussion

A. Standard of Review. Before considering a Federal Habeas Petition -- even one which properly presents Federal constitutional claims -- we "must first determine whether the petitioner has fairly presented [those claims] to the state court." McCall v. Benson, 114 F.3d 754, 757 (8th Cir. 1997), citing Duncan v. Henry, 513 U.S.

364, 365-66 (1995); see also Barrett v. Acevedo, 169 F.3d 1155, 1161 (8th Cir. 1999)(en banc). To have fairly presented a claim in the State Courts, petitioners must have referred to a specific Federal constitutional right, a particular constitutional provision, a Federal constitutional case, or a State case raising a pertinent Federal constitutional issue in a claim before the State Courts. See, Abdullah v. Groose, 75 F.3d 408, 411 (8th Cir. 1996) [en banc], cert. denied, 517 U.S. 1215 (1996).

A petitioner who has failed to fairly present a claim to the State Courts, that he seeks to advance in a Federal Habeas Petition, must tread the narrow path between exhaustion and procedural default. Section 2254(b)(i) precludes Federal Courts from issuing Writs of Habeas Corpus unless the Petitioner has first presented his claim for relief to the State Courts. See, Gray v. Netherland, 518 U.S. 152, 161 (1996), citing Castille v. Peoples, 489 U.S. 346, 351 (1989); Joubert v. Hopkins, 75 F.3d 1232, 1240 (8th Cir. 1996), cert. denied, 518 U.S. 1029 (1996). Claims are exhausted under this doctrine, only when the same factual underpinnings, and legal theories being asserted in the Federal Habeas Petition, were first properly raised in State Court proceedings. See, Abdullah v. Groose, supra at 411; Krimmel v. Hopkins, 56 F.3d 873, 876 (8th Cir. 1995), cert. denied, 516 U.S. 1015 (1995). Accordingly, State Courts should have the first opportunity to determine whether a